IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2018

IN RE KEILYN O. ET AL.

**Appeal from the Juvenile Court for Bedford County**
**No. 2016-JV-217    Charles L. Rich, Judge**

_____

**No. M2017-02386-COA-R3-PT**

_____

Mother appeals the termination of her parental rights to two children.  The juvenile court found six statutory grounds for termination and that termination of the mother's parental rights was in the children's best interest.  We conclude that the evidence was less than clear and convincing as to one of the statutory grounds and that two other statutory grounds did not apply in this instance.  But the record contains clear and convincing evidence to support three grounds for termination and that termination is in the children's best interest.  So we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, JJ., joined.  THOMAS R. FRIERSON II, J., filed a concurring opinion.

Emeterio "Terry" R. Hernando, Lewisburg, Tennessee, for the appellant, Mary O.

Herbert H. Slatery III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

A.

Mary O. ("Mother") had five children, ranging in age from sixteen to three.  This case involves termination of her parental rights to two of those children, Keilyn, born

October 2002, and Jahlin, born January 2004. Mother had a long history of addiction to prescription medications, a problem she attempted to remedy several times over the years with limited success.

Her present difficulties began in September 2015 after her boyfriend evicted her from his home. She moved in with friends, along with three of her children, including Keilyn and Jahlin. In November, Mother left her children with her friends and enrolled in a 14-day inpatient drug treatment program in Madison, Alabama. While Mother was gone, one of the children threatened another student at school and was taken to the police department. When Mother's friends were notified, they informed the police that they were no longer willing to care for the children due to the incident at school and the children's behavior in the home.

On November 20, 2015, DCS took the children into emergency custody. And, shortly thereafter, DCS filed a petition for temporary legal custody and to find the children dependent and neglected in the Juvenile Court of Bedford County, Tennessee.

In December 2015, Mother participated by telephone in the development of a permanency plan. The goal of the plan was to return the children to Mother's custody. Based on conversations with Mother, DCS had three primary concerns: Mother's history of drug addiction, her untreated mental health issues, and her lack of housing. To address these concerns, the plan required Mother to complete a series of action steps. Mother needed to provide proof of completion of the Alabama program and any follow up recommendations, sign a release of information for the program, participate in random drug screens, and keep anyone under the influence of alcohol or drugs away from the children. Because Mother reported that she had been diagnosed with bipolar disorder and attention-deficit hyperactivity disorder or ADHD, she was required to submit to a mental health assessment, follow all recommendations, provide proof of completion, and sign a release. Mother also needed to secure housing for a three-month period and notify DCS of the address. The plan anticipated that Mother would pay child support and participate in supervised visitation with the children. DCS informed Mother that it could help her complete her action steps.[1]

Soon after development of the plan, Mother was arrested for a probation violation.[2] She pled guilty to failure to appear and evading arrest. She remained incarcerated from January 3 to March 11, 2016.

_____

[1] Although the permanency plan was revised twice without Mother's participation, Mother's responsibilities remained essentially the same in the revised plans.

[2] Before entering the Alabama program, Mother pled guilty to shoplifting and was sentenced to 11 months and 29 days in jail. She was granted probation, and her jail time was suspended other than a mandatory 48-hour period.

In Mother's absence, the juvenile court held a ratification hearing on the permanency plan. After reviewing the plan, the court found the requirements in the plan to be reasonable and related to remedying the conditions that necessitated foster care and were in the best interests of the children.

Following her release, Mother attended the March 2016 adjudicatory hearing with her appointed counsel. She stipulated at the hearing that the facts alleged in the petition for temporary custody were true. And the court found by clear and convincing evidence that the children were dependent and neglected. The court also ordered supervised visitation and directed Mother to pay $50 per week in child support.

The DCS family service worker (the "FSW") assigned to the case met with Mother and her attorney that same day and reviewed the permanency plan and the criteria and procedures for termination of parental rights. She specifically told Mother that she could lose her parental rights if she failed to visit her children or pay child support. She also provided Mother with a copy of the plan and the criteria for termination of parental rights. Mother told the FSW that she was living with a friend but did not provide the address. She also explained that she was in the process of obtaining a new telephone and would let the FSW know her new number.

Even with a new phone number, the FSW had difficulty contacting Mother. Mother did not answer the FSW's calls. And when the FSW scheduled a meeting, Mother did not show.

During a phone conversation in early April 2016, the FSW again discussed the requirements of the plan with Mother. Mother reported on her progress under the plan, specifically that she was attending narcotics anonymous meetings, seeing a counselor, and actively looking for new employment. But she still did not provide an address, and she declined the FSW's offer to help her complete her responsibilities.

In April, Mother found a job. Between April and November 2016, she earned $800 a month. After paying her expenses, Mother typically had $200-$400 in discretionary funds. Although she never paid any formal child support for Keilyn or Jahlin, Mother bought various items for the boys, such as school supplies, backpacks, shoes, groceries, and soap.

DCS placed Keilyn and Jahlin in a resource home approximately four hours away from Mother. DCS initially allowed the children to visit their maternal grandmother on weekends so that Mother could visit under the grandmother's supervision. But on July 1, 2016, the grandmother did not return the children to foster care as scheduled. And, on July 6, it was discovered that the maternal grandmother had allowed the children to spend several days unsupervised with Mother. DCS discontinued the weekend visits at grandmother's home. Mother and maternal grandmother were informed that they should

visit the children at the foster home. Mother testified that she spoke with her children every day but did not visit them again until Thanksgiving 2016 when DCS allowed the children to spend the holiday at their maternal grandmother's home.[3]

On July 20, Mother informed the FSW that she had completed her action steps. The FSW requested that Mother meet with her to review her progress on the permanency plan and to provide the necessary proof of completion. The FSW explained that, without the documentation, she could not start the reunification process. Despite this warning, Mother failed to comply with either request.

During July and August, although Mother spoke with the FSW and exchanged text messages, she failed to appear for scheduled meetings even when she selected the meeting date. In late August, after numerous requests for a meeting, Mother told the FSW that a meeting was unnecessary as she had completed her responsibilities under the permanency plan and did not need any assistance. After August, the FSW again lost contact with Mother.

On November 9, 2016, DCS filed a petition to terminate Mother's parental rights to Keilyn and Jahlin. The petition alleged six grounds for termination: abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, and failure to assume custody. DCS was unable to personally serve Mother and was granted permission to serve her by publication after presenting proof that she was evading service.

In April 2017, over a year since her last meeting with DCS, Mother met with the FSW to discuss her progress. Again, Mother failed to provide proof that she had completed any of her responsibilities. The FSW created a list of her most important action steps, which Mother acknowledged by signing. But when the topic of termination of parental rights arose, Mother became angry and left.

In May, Mother tested positive for methamphetamine and THC.[4] Also in May, Mother finally obtained a mental health evaluation. Mother testified that the evaluation recommended inpatient treatment, but she did not follow the recommendation. Instead, she obtained two more evaluations from other providers, hoping for a more favorable

---

[3] At trial, Mother maintained that, after the July incident, she was told she could no longer visit her children. But in subsequent testimony, Mother claimed that she was unable to visit because of the travel distance.

[4] THC, or tetrahydrocannabinol, "is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

result.  At the time of trial, Mother had not received any treatment for her mental health issues.  And although she had been prescribed medications for her diagnoses in the past, she admitted that she had not taken the prescribed medications while the boys were in foster care.

In June 2017, a new family service worker was assigned to Mother's case.  Although she immediately requested a meeting with Mother to discuss her progress, the new family service worker encountered similar difficulties as the FSW.  Eventually, Mother disclosed that she was avoiding the meetings because she was afraid of being arrested on outstanding warrants.

In July, Mother participated by telephone in a team meeting to discuss Keilyn's treatment plan.  Mother acknowledged that she was unable to care for her children and asked that maternal grandmother be given custody of Keilyn and Jahlin.  As the meeting progressed, Mother repeatedly took over the conversation and refused to listen to the other participants, including Keilyn who responded angrily.  Eventually, Mother's behavior forced an end to the meeting.

Afterward, Mother called to apologize for her behavior.  She admitted that, when she took her prescribed medications, she was calmer and better able to listen.  But she exhibited similar behavior at the subsequent foster care review board meeting that month, refusing to listen to any discussion of her responsibilities in the permanency plans or for the welfare of her children.

Later, Mother's probation was revoked based on her positive drug test in May.[5]  She went to jail on August 6, 2017, and remained in Bedford County jail through the trial of the parental termination case.  After her release from Bedford County jail on October 15, 2017, Mother anticipated being transferred to jail in a neighboring county to serve an unspecified amount of additional time on separate charges.

At trial, Mother repeatedly asserted that she had fulfilled her responsibilities by completing the Alabama drug-treatment program.  And she claimed to be unaware that she was obligated to pay child support for Keilyn and Jahlin.  According to Mother, the FSW never adequately explained her responsibilities, and "for a year and a half, I didn't understand exactly what I needed to do."  But she never told the FSW she was confused or asked for clarification.  She also expressed surprise that the family service workers had difficulty contacting her because, according to Mother, her address and phone number never changed.  She blamed her failure to appear at scheduled meetings on miscommunication on both sides.

---

[5] Mother was arrested again in January 2017 for failure to appear.  On February 1, 2017, she was granted another probation period.

She acknowledged that, because she was angry with DCS for taking her children into custody, she refused to accept any help from the FSW. But she told the court that now she was willing to work with DCS to regain custody of her children.

On December 6, 2017, the juvenile court entered a final order terminating Mother's parental rights to Keilyn and Jahlin. The court found clear and convincing evidence of the six statutory grounds for termination alleged in the petition. The court also found clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. In specified situations, the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id*. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P.

13(d). When asked to review a trial court's determinations of witness credibility and the weight to be afforded particular testimony, we grant considerable deference to the trial judge who had the opportunity to observe the witnesses' demeanor and hear their in-court testimony. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). We will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

In termination proceedings, we "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A. GROUNDS FOR TERMINATION

As an initial matter, DCS concedes on appeal that two grounds for termination found by the trial court, abandonment by failure to provide a suitable home and persistence of conditions, were not applicable. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(ii), -113(g)(3). After reviewing the record, we agree.

Abandonment is the first enumerated ground for termination of parental rights. *Id*. § 36-1-113(g)(1). The parental termination statutes provide five alternative definitions for "abandonment." *Id*. § 36-1-102(1)(A). Proof of abandonment by failure to provide a suitable home requires as a showing that the children were removed from the parent's home. *Id*. § 36-1-102(1)(A)(ii). Likewise, persistence of conditions applies when the "child has been removed from the home of the parent." *Id*. § 36-1-113(g)(3).

In this case, DCS removed the children from the home of Mother's friends, not Mother's home. So neither the statutory ground of abandonment by failure to provide a suitable home nor persistence conditions applies. Thus we focus our analysis on the other four statutory grounds found by the trial court.

1. Abandonment

Another definition of abandonment is premised upon "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, because the petition was filed on November 9, 2016, the relevant four-month period is July 9, 2016, to November 8, 2016, the day before the

petition was filed.[6] *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

To terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

a. Willful Failure to Visit

The juvenile court found that Mother had "abandoned these children in that she has willfully failed to visit or to engage in more than token visitation with the children for four consecutive months immediately preceding the filing of the petition." Mother concedes that she did not visit her children during the relevant four-month period but maintains that her failure to do so was not willful.

Our supreme court has stated that "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. Although Mother claimed that she was told she could no longer visit the children after July 6, 2016, the FSW testified differently. The trial court did not credit Mother's testimony, and we will not second guess the court's credibility determination. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.").

Mother also asserts that transportation issues prevented her from visiting her children during the relevant period. The resource home was four hours away. Mother did not have a driver's license and was dependent on others for transportation. While Mother never asked for help with transportation, we find no indication that DCS specifically offered to help with transportation to visit the children. And, in lieu of visits, Mother talked with her children on a daily basis.

We have held that a parent's failure to visit was not willful when the parent lacked sufficient resources to travel the necessary distance and the parent maintained regular

---

[6] Throughout the trial, all parties mistakenly believed the relevant four-month period was July 9, 2016, to November 9, 2016.

phone contact with the children. *See In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *6-8 (Tenn. Ct. App. Nov. 25, 2014) (reversing finding that failure to visit was willful when father spoke to children every other week by telephone and lacked the financial resources or available alternatives to make seven hour trip); *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8-10 (Tenn. Ct. App. Mar. 2, 2009) (concluding that mother's irregular visitation did not constitute willful failure to visit when the distance was prohibitive, DCS did not offer to help with transportation costs, and mother stayed in regular contact with her children by telephone). And even without regular phone conversations, transportation issues may preclude a finding of willfulness. *See In re Emma S.*, No. M2017-01243-COA-R3-PT, 2018 WL 2041574, at *6-9 (Tenn. Ct. App. Apr. 30, 2018) (reversing trial court's conclusion that failure to visit was willful when mother lacked a driver's license or a car and was dependent on others for transportation); *In re Lyric J.*, No. M2014-00806-COA-R3-PT, 2014 WL 7182075, at *5-6 (Tenn. Ct. App. Dec. 16, 2014) (concluding that father's failure to visit was not willful given his limited financial means and the distance).

Based on this record, we conclude that the evidence was less than clear and convincing that Mother abandoned her children by willful failure to visit during the four months preceding the filing of the petition. So we vacate the juvenile court's finding that DCS met its burden of proving this ground for termination.

b. Willful Failure to Support

The juvenile court also found that Mother had abandoned the children "by willfully failing to support or make reasonable payments toward the support of the children" during the relevant period. Because Mother's failure to pay child support is undisputed, our focus is on whether her failure to pay was willful.

A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

Mother had the financial ability to pay child support. During the relevant time period, she earned $800 per month, and her expenses were approximately $150 per month. She only bought an unspecified amount of groceries and school supplies for her sons. The court found her purchases to be token support; the evidence does not preponderate against this finding.

On appeal, Mother argues that she was unaware of her obligation to pay child support. Like the trial court, we do not find this argument persuasive. Both the permanency plan and the adjudicatory hearing order addressed Mother's obligation to

pay child support. Mother and her attorney were present at the adjudicatory hearing, and after the hearing, the FSW explained both her obligation to support her children and the consequences of failure to do so. Additionally, as we have previously held, "the obligation to pay support exists even in the absence of a court order to do so." *State v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004).

2. Substantial Noncompliance with Permanency Plan

The juvenile court found Mother "failed to comply in a substantial manner with the reasonable requirements of the Permanency Plans, which are reasonably related to remedying the conditions which necessitated foster care placement." *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *see also In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

Mother does not dispute the juvenile court's finding that the requirements of the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Based upon our review, we conclude that the evidence was clear and convincing that the requirements were reasonable and related to remedying the conditions that necessitated foster care.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, 2009 WL 528922, at *8.

Mother admitted that, other than completing the Alabama drug-treatment program and obtaining a mental health evaluation, she made no effort to comply with her plan responsibilities. We recognize that she had been incarcerated several times since the children entered foster care. Even so, she was not incarcerated, other than a few days, between March 2016 and August 2017. During that time and despite numerous requests from the FSW, Mother never substantiated her claim of completion of the Alabama program or compliance with any follow up recommendations. She also never sought treatment for her mental health issues, choosing instead to have a series of evaluations, each time hoping for a better outcome. And she never obtained safe and stable housing. Between November 2015 and her most recent incarceration, Mother admittedly lived "[n]owhere; with my mom" and "back and forth" between friends.

10

We are unpersuaded by Mother's argument that, for a year and a half, she did not understand what she needed to do. She participated in the development of the plan, and the FSW explained her responsibilities several times. She never asked any questions or expressed confusion to the FSW, leading the FSW to testify that Mother understood the plan. The juvenile court credited the FSW's testimony on this issue, and this record lacks sufficient evidence to overturn the court's credibility finding. *See Richards*, 70 S.W.3d at 733-34.

## 3. Failure to Manifest an Ability and Willingness to Personally Assume Custody

Finally, the court found termination of parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, DCS must prove by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *See In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). Although Mother testified that she was both willing and able, her actions proved otherwise. She refused to cooperate with DCS. At the time of trial, she was incarcerated and had completed virtually none of her plan responsibilities. She could not provide a safe and stable home for her children, had relapsed, and had failed to address her mental health issues.

With respect to the second prong, DCS must establish that placing the children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the children by the same quantum of proof. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018). Previously, we have described "a risk of substantial harm" in these terms:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While

11

the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

Placing the children in Mother's custody would put them with an unstable caregiver still struggling with drug addiction. Mother's last attempt to treat her drug addiction was two years ago; since that time she had relapsed and tested positive for methamphetamine. While the extent of Mother's mental health issues was unknown, this record was replete with evidence of her erratic behavior. And she admitted that she had not been taking the medication prescribed to ameliorate her behavior.

## B. BEST INTEREST OF THE CHILDREN

Next we must determine whether termination of Mother's parental rights is in the children's best interests. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. "These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

After considering the evidence in light of the statutory factors, the juvenile court found all statutory factors favored termination of Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). Like the trial court, we conclude that clear and convincing evidence supports the finding that termination of Mother's parental rights was in the children's best interest.

12

The juvenile court found that Mother had not made such an adjustment of circumstance, conduct, or conditions as to make it safe for the boys to be in her home and, even after reasonable efforts by DCS, a lasting adjustment did not appear reasonably possible. *See id.* § 36-1-113(i)(1), (2). The evidence does not preponderate against this finding, which weighs in favor of termination. Keilyn and Jahlin had been in foster care for two years. In that time, Mother had made no real attempt to address her mental health issues and had relapsed into drug use. She refused to cooperate with DCS and repeatedly turned down the family service workers' offers of assistance. At the time of trial, she was incarcerated and had no home for her children.

The court also found that Mother failed to maintain regular visitation or contact with Keilyn and Jahlin and no longer had a meaningful relationship with them. *See id.* § 36-1-113(i)(3), (4). The evidence does not preponderate against these findings, which also weigh in favor of termination. After July 2016, most of Mother's contact with her children was by telephone. Although Mother visited her children a few times after the petition to terminate parental rights was filed, she admitted that she kept her visits short because she was afraid of being arrested on outstanding warrants. And while Mother maintained that she had a close, loving relationship with her sons, both family service workers and Keilyn's therapist testified that Mother's behavior had damaged that relationship. The boys expressed frustration and anger at Mother's lack of progress on the plan and her inability to listen to their concerns.

The fifth factor concerns the "effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." *Id.* § 36-1-113(i)(5). The juvenile court determined that returning the boys to Mother's care would likely have an adverse impact on the boys' emotional conditions. This record contains scant information about the boys' relationship with their current caregivers. But given the boys' anger and frustration toward Mother, we cannot say that the evidence preponderates against the court's finding.

The court also found that Mother's past neglect of Keilyn and Jahlin and abuse of a sibling weighed in favor of termination. *See id.* § 36-1-113(i)(6). The evidence does not preponderate against this finding. Mother asserts that she never harmed her children. But the juvenile court found Mother neglected the boys when she left them to live with friends while she went to drug treatment. And she admitted that she lost custody of a younger child because he was born with drugs in his system.

The seventh factor looks at "[w]hether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner." *Id.* § 36-1-113(i)(7). The evidence does not preponderate against the court's finding that Mother's incarceration and recent positive drug test

13

weighed in favor of termination. At the time of trial, Mother had no home because she was incarcerated, and she admitted that she had relapsed.

The evidence also supports the court's finding that Mother's mental and emotional status would adversely impact her ability to provide safe and stable care for Keilyn and Jahlin. *See id.* § 36-1-113(i)(8). Mother let her anger at her situation impede her ability to comply with her plan responsibilities in a timely manner. She also failed to follow the recommendations from her mental health evaluations. And her ongoing behavior issues frustrated and angered her sons, resulting in extensive therapy for Keilyn. She also continued to struggle with her drug addiction.

The juvenile court also found that Mother had not paid any child support while the boys had been in foster care despite having the ability to do so. *See id.* § 36-1-113(i)(9). The record supports this finding, which also weighs in favor of termination.

Finally, while Mother argues that the boys' relationship with their siblings weighs against termination, we cannot agree. Mother admitted that she gave custody of her oldest child to maternal grandmother fourteen years ago and lost custody of her youngest child to his biological father because of her drug abuse. And at the time of trial the remaining sibling was living with his biological father. In light of all the evidence in this record, preservation of the already tenuous relationship among these siblings does not change the outcome.

### III.

Based on the concession of DCS and our review of the record, we vacate the juvenile court's findings that termination of Mother's parental rights was appropriate on the grounds of abandonment by failure to provide a suitable home and persistence of conditions. Upon our review of the record, we also vacate the juvenile court's finding of abandonment by willful failure to visit. Still the record contains clear and convincing evidence to support terminating Mother's parental rights on the grounds of abandonment by willful failure to support, substantial noncompliance with the permanency plan requirements, and failure to assume custody or financial responsibility of the children. We further conclude that the record contains clear and convincing evidence that termination is in the children's best interest. Thus we affirm the judgment of the juvenile court terminating Mother's parental rights as modified by this opinion.

_____
W. NEAL MCBRAYER, JUDGE